UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

MICHELLE KAYE DUDLEY,              )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )        No.  1:15 CV 151 JMB
                                   )
CAROLYN W. COLVIN,                 )
Acting Commissioner of Social Security,  )
                                   )
        Defendant.                 )

## MEMORANDUM AND ORDER

This cause is on appeal from an adverse ruling of the Social Security Administration.  This suit involves an Application for Supplemental Security Income. The matter is fully briefed, and for the reasons discussed below, the Commissioner's decision is reversed.  All matters are pending before the undersigned United States Magistrate Judge with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.      Procedural History

On September 18, 2012, Plaintiff Michelle Kaye Dudley ("Plaintiff") filed an Application for Supplemental Security Income ("SSI") payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 122-30)[1]   Plaintiff claimed that her disability began on December 30, 2010, as a result of anxiety, depression, and lower back problems.  On initial consideration, the Social Security Administration denied Plaintiff's claim for benefits.  Plaintiff

_____

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer (ECF No. 12/filed November 2, 2015).

requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 25, 2014. (Tr. 25-55) Plaintiff testified and was represented by counsel. Vocational Expert Alissa Smith also testified at the hearing. (Tr. 50-53, 107-08) Thereafter, on March 19, 2014, the ALJ issued a decision denying Plaintiff's claim for benefits. (Tr. 8-20) After considering the representative's brief, the Appeals Council found no basis for changing the ALJ's decision and denied Plaintiff's request for review on June 30, 2015. (Tr. 1-5, 253-54)

Plaintiff filed the instant action on August 26, 2015. Plaintiff has exhausted her administrative remedies and the matter is properly before this Court. Plaintiff has been represented by counsel throughout all relevant proceedings.

In her initial brief to this Court, Plaintiff raises two issues. First, Plaintiff argues that the ALJ erred in weighing treating physician Dr. Courtney Johnson's opinions as it is unclear what weight the ALJ assigned, and he failed to give good reasons for the weight given to Dr. Johnson's opinions. Next, Plaintiff argues that the ALJ's Residual Functional Capacity ("RFC) is not supported by substantial weight. The Commissioner filed a detailed brief in opposition. In her reply brief, Plaintiff again argues that the ALJ failed to indicate what weight was given to Dr. Johnson's opinion and to give good reasons for doing so; and the RFC is not supported by substantial weight.

As explained below, the Court has considered the entire record in this matter. Because the decision of the Commissioner is not supported by substantial evidence, it will be reversed. The undersigned will first summarize the decision of the ALJ and the administrative record. Next, the undersigned will address the issue regarding the ALJ's failure to accord weight to Dr. Johnson's opinions and to articulate specific reasons in weighing Dr. Johnson's opinions.

Because this matter is being remanded, the undersigned will not address Plaintiff's other contentions regarding her RFC.

## II.    Decision of the ALJ

On March 19, 2014, the ALJ issued an adverse decision denying Plaintiff's request for SSI benefits. The ALJ acknowledged that the administrative framework required him to follow a five-step, sequential process in evaluating Plaintiff's claims. (Tr. 11-12) At step one, the ALJ concluded that Plaintiff had not engaged in any substantial gainful activity since September 18, 2012. (Tr. 13) At step two, the ALJ found Plaintiff had the severe impairments of "degenerative disc disease of the lumbar spine, medullary sponge kidney with nephrolithiasis, depression, personality disorder, and anxiety disorder/posttraumatic stress disorder." (Tr. 13) After considering all of Plaintiff's impairments, severe and non-severe, the ALJ concluded, however, that none of Plaintiff's impairments, either singly or in combination, significantly limited her ability to perform basic work-related activities for 12 consecutive months. (Tr. 13-14)

The ALJ articulated the following RFC for Plaintiff:

[T]he claimant has the residual functional capacity to lift 10 pounds occasionally and 10 pounds frequently.[2] She can walk or stand for two hours and sit for six hours out of an eight [hour] workday. She may occasionally climb stairs, but should never climb ropes, scaffolds or ladders. She can frequently balance and occasionally stoop, crouch, kneel or crawl. She is limited to occasional pushing and pulling with the lower extremities. She should avoid unprotected heights and hazardous moving machinery. In addition, she is limited to simple, routine, repetitive tasks. She may work in proximity to others, but is limited to jobs that do not require close cooperation and interaction with coworkers, in that, she would work better in relative isolation. She should have no interaction with the general public. She retains the ability to maintain attention and concentration for minimum two-hour period at a time, to adapt to changes in the workplace on a basic level and to accept supervision on a basic level.

_____
[2]The undersigned finds that it is not clear what lifting capacity the ALJ assigned to Plaintiff.

(Tr. 15)

The ALJ also made an adverse credibility finding that no doubt influenced his RFC assessment. The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are only partially credible for the reasons explained in this decision." (Tr. 16) The ALJ found that Plaintiff's "allegations of debilitating back pain are not supported by the objective evidence." (Tr. 16) Likewise, the ALJ found that the medical evidence of record does not fully support Plaintiff's allegations of psychiatric symptoms, and her statements regarding mental impairments are only partially credible. (Tr. 17)

The ALJ summarized his conclusions regarding weight given to the medical sources' opinions as follows:

> [T]he undersigned gives significant weight to the opinions of the State agency psychological consultant.[3] As a State agency consultant, this doctor is familiar with the disability determination process and the Regulations, including the terms of art and legal and medical standards set forth therein. More significantly, the State agency consultant's opinions are consistent with the medical evidence of record, which shows preserved memory, attention and concentration functions, and with her activities of daily living, which show the capacity for limited social interaction.
>
> The undersigned has considered the medical source statement from the [Plaintiff's] psychiatrist, Courtney Johnson, M.D. However, while the medical evidence of record does demonstrate some degree of psychological impairment, it does support the degree of limitation opined by Dr. Johnson. Mental status examinations have consistently revealed normal attention, concentration and memory. Although Dr. Johnson's treatment notes document subjective reports of anxiety and irritability, these allegations are not totally consistent with the [Plaintiff's] activities of daily living. As noted, she goes shopping, she can go out alone, and she goes to the library. This shows that the [Plaintiff] is capable of at least limited social interaction. Likewise, the undersigned gives little weight to the opinions of Charlie Harrison, MS, LPC. The medical evidence of record, as just described, does not support marked and extreme limitations.

---

[3]The ALJ did not use Dr. Cottone's name in discussing his opinion, but based on the exhibit cited, the undersigned finds the ALJ was discussing Dr. Cottone's opinions.

(Tr. 18) (internal citations omitted)  The ALJ found that Plaintiff has no past relevant work.  (Tr. 19)  The ALJ further found that, considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy she could perform, including a document preparer, a pharmaceutical processor, and a printed circuit board screener. (Tr. 19)

## III.    Evidence Before the ALJ

The administrative record in this matter includes the hearing transcript, medical records, and forms completed by Plaintiff and state agency physicians.  Although the Court has carefully considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the records most relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed.  The following is a summary of pertinent portions of the record.

### A.    The Hearing Before the ALJ

The ALJ conducted a hearing on October 24, 2013.  Plaintiff was present and represented by an attorney.  Also present was a Vocational Expert ("VE"), Alissa Smith.

#### 1.  Plaintiff's Testimony

Plaintiff testified primarily in response to questions posed by her attorney, with additional questions interjected by the ALJ.  At the time of her hearing, Plaintiff was thirty-five years old. (Tr. 31)  Plaintiff testified that she received her GED in 2006.  (Id.)  Plaintiff is divorced and lives with her disabled, fifty-eight year old father.  Plaintiff's father drove her to the hearing even though she has a driver's license.  Plaintiff has four children, ages 15, 11, 7, and 5, but she does not have custody of any her children.  (Tr. 32)

Plaintiff testified that her lower back pain and tension in her shoulders prevent her from working. (Tr. 33) As treatment for her back, Plaintiff has received steroid shots, prescribed medications, and an EKG. (Tr. 36) Although Dr. Vaught reportedly recommended surgery, Plaintiff explained that she could not afford the treatment due to lack of medical coverage, and she wanted to consider other options. (Tr. 37) On November 21, 2013, Dr. Sandvoe prescribed a muscle relaxer, and Plaintiff thought that helped. On November 19, 2013, Plaintiff received Medicaid. (Id.) Plaintiff testified that Dr. Lambrou at Chaffee Medical Clinic treated her monthly and prescribed pain medications and administered a steroid shot. (Tr. 40) Plaintiff also has chronic kidney disease that results in kidney stone issues if she does not manage her diet appropriately. (Tr. 43)

Plaintiff testified that Dr. Courtney Johnson treats her mental health issues which include anxiety, depression, and PTSD. (Tr. 45) Plaintiff reported a history of physical, sexual, and mental assaults. (Tr. 46) Plaintiff testified that she avoids public places because of her panic attacks. Plaintiff takes Cymbalta, Hydrocodone, and Xanax. (Id.) Plaintiff noted that the Hydrocodone and Xanax medications have helped her tremendously but she is uncertain as to the Cymbalta since she just started taking that medication. (Tr. 47) Plaintiff reported no negative side effects from her medications.

Plaintiff can lift five pounds; can stand for at most fifteen minutes; and can sit on average for fifteen minutes. (Tr. 34) Plaintiff testified that she had used a push walker with a seat for ambulation, but she stopped using the walker after receiving treatment for her pinched sciatic nerve. (Tr. 42)

Plaintiff spends much of the day, up to two to three hours, lying on her stomach. (Tr. 35)

She also spends time reading, catching up on junk mail, and making entries in her journal.  (Id.)

Plaintiff does most of the household chores including the cooking, laundry, mopping, and

vacuuming.  (Tr. 49)  Plaintiff cuts the grass using a riding lawn mower.  (Id.)

## 2. **Testimony of Vocational Expert Alissa Smith**

Vocational Expert Alissa Smith ("VE") testified at the hearing.  The ALJ asked the VE to

assume Plaintiff has no past relevant work.  (Tr. 51)

The ALJ asked the VE to assume someone similar to Plaintiff in age, education, and the

same past work history who

> retains the capacity to occasionally lift 10 pounds, frequently 10 pounds, walk or
> stand two hours out of an eight hour day, sit for six hours out of an eight hour day.
> She can occasionally climb stairs.  She should never climb ropes, scaffolds or ladders.
> She can frequently balance but occasionally stoop, crouch, kneel and crawl.  She's
> limited to occasional pushing and pulling with the lower extremities.  She should
> avoid unprotected heights and hazardous moving machinery.  She's limited to jobs
> that consist of simple, routine, repetitive type tasks.  She may work in proximity to
> others but is limited to jobs that consist that do not require close cooperation,
> interaction with co-workers.  She would work better in relative isolation.  She should
> have no interation and cooperation with the general public.  Assume she retains the
> ability to maintain attention and concentration for a minimal two hour periods at a
> time, adapt to changes in the work place on a basic level, accept supervision on a
> basic level.  Can you identify jobs in the local, national and regional economy this
> hypothetical person could perform?

(Tr. 52)  The VE explained that the example jobs are sedentary, and such individual could

perform jobs existing in significant numbers including a document preparer, a pharmaceutical

processor, and a printed circuit board screener.  (Id.)

The ALJ's second hypothetical added the following mental limitation:  "due to

psychologically based symptoms she'd be unable to interact and cooperate with co-workers,

unable to interact and cooperate with the general public, she'd be unable to accept supervision

and unable to maintain acceptable levels of punctuality and attendance." (Tr. 52) The VE opined that such individual would be unemployable.

Plaintiff's counsel then asked if the hypothetical individual could "lift less than five pounds, stand less than one hour total, sit less than one hour total, occasionally reach, handle, finger, feel and needs to lie down once per day for 30 minutes[,] would that individual be able to work at all?" (Tr. 53) The VE opined that such individual would also be unemployable.

### B.   Forms Completed by Plaintiff

In a Disability Report - Adult form, Plaintiff indicated that she stopped working on December 29, 2010, after being laid off and then fired. (Tr. 165) In a Function Report - Adult form completed on September 28, 2012, Plaintiff reported going grocery shopping weekly and doing the laundry. (Tr. 197-98) Plaintiff indicated that she does not like public places and has problems getting along with others. Plaintiff reported using a computer to look for employment. (Tr. 204)

### C.   Medical Records and Source Opinion Evidence

#### 1.   General History

The medical evidence in the record shows that Plaintiff has a history of degenerative disc disease of the lumbar spine, medullary sponge kidney/kidney stones, depression, personality disorder, and anxiety disorder/post-traumatic stress disorder ("PTSD"). (Tr. 268-553) The relevant medical evidence will be discussed in additional detail below, as part of the Court's analysis of the arguments raised by Plaintiff herein.

2.    **Community Counseling Center - Dr. Courtney Johnson, Caitlyn Quinn, and Daniela Kantcheva** (Tr. 302-16, 398-446, 509-10)

Between August 31, 2012, and December 19, 2013, Plaintiff received psychiatric care for her depressive symptoms at Community Counseling Center.

On August 31, 2012, Caitlyn Quinn, M.A., PLPC, completed an Intake Note/Psychiatric History. Plaintiff reported an increase in the severity of her depressive symptoms due to financial problems and feelings of loneliness. Plaintiff noted that she was not taking any medications. Ms. Quinn found Plaintiff to be alert, responsive and cooperative during the interview process. Plaintiff indicated that she had a loss of energy and diminished ability to concentrate. Her main stressors were problems with her social environment, economic problems, and occupational problems. Ms. Quinn diagnosed Plaintiff with major depressive disorder and PTSD, and scheduled Plaintiff for a psychiatric evaluation to determine medication needs.

During Medical Psychotherapy on September 9, 2012, Plaintiff complained of feeling extremely stressed out. Plaintiff reported being unemployed for two years, receiving unemployment benefits during that time, and looking for a job but being unable to find one. Daniela Kantcheva, APRN, noted Plaintiff to be alert and oriented to self, place, time and situation. Ms. Kantcheva listed major depression, methamphetamine abuse, cannabis abuse, alcohol abuse, severe occupational problems, severe economic problems, and moderate problems with social environment in her diagnostic impression. Ms. Kantcheva prescribed Remeron for depression and Vistaril for anxiety. After starting the medications, Plaintiff broke out in a rash so she discontinued the medications as indicated in a phone call record.

In follow-up treatment on September 14, 2012, Plaintiff reported the rash disappeared

once she discontinued the medications. Ms. Kantcheva prescribed Elavil. On September 28, 2012, Plaintiff's mood and affect were anxious/tearful, and Plaintiff was alert and oriented to time, place, and person. Ms. Kantcheva prescribed Trazodone and scheduled an appointment with Dr. Courtney Johnson.

Dr. Johnson completed a psychiatric evaluation on October 9, 2012, and prescribed Vistaril to help alleviate Plaintiff's stress. Dr. Johnson diagnosed Plaintiff with major depressive disorder, recurrent/moderate personality disorder not otherwise specified and noted that Plaintiff had severe problems with coping skills. In all of her treatment notes, Dr. Johnson noted that Plaintiff was on time for the scheduled appointment for medication management and therapy.

In follow-up treatment on October 29, 2012, Plaintiff expressed interest in starting a trial of Valium to alleviate her anxiety problems. Dr. Johnson noted that a trial of benzodiasepine would be "contraindicated in this patient with a history of polysubstance dependence due to a risk of abuse." (Tr. 443) Dr. Johnson added Wellbutrin and continued Vistaril as part of Plaintiff's medication regimen. Dr. Johnson encouraged Plaintiff to stop smoking.

In follow-up on November 8, 2012, Plaintiff reported feeling more on edge, being involved in recreational activities, and smoking more. Dr. Johnson noted that Plaintiff had a reported history of poorly tolerating Celexa, Zoloft, Elavil, Effexor, and Trazodone. Dr. Johnson continued Wellbutrin XL in the same dosage and added Viibryd. Plaintiff returned on November 13, 2012, for medication management and completion of disability paper work. Dr. Johnson noted Plaintiff's memory and concentration were intact based on their conversation. Plaintiff reported being insecure around other people.

On December 7, 2012, Plaintiff reported continued problems being around people and in

public, and difficulty coping with a past abusive relationship. Dr. Johnson noted Plaintiff's memory and concentration were intact. Dr. Johnson adjusted Plaintiff's medication regimen by tapering and then discontinuing Vistaril and starting Doxepin. In follow-up on December 18, 2012, Plaintiff admitted not starting the trial of Doxepin yet. During treatment on January 10, 2013, Dr. Johnson adjusted Plaintiff's medication regimen by increasing the dosage of Wellbutrin XL and Doxepin. Plaintiff reported being more irritable.

On February 27, 2013, Plaintiff reported irritability caused by interpersonal problems with family members and problems coping. Dr. Johnson increased Plaintiff's dosage of Wellbutrin, discontinued Doxepin, and prescribed Abilify. Plaintiff reported that she stopped taking Abilify after four days because of vague somatic complaints. Dr. Johnson noted Plaintiff's memory and concentration were intact based on their conversation. On April 4, 2013, Dr. Johnson adjusted Plaintiff's medication regimen by discontinuing Abilify and prescribing Doxepin.

In follow-up treatment on June 4, 2013, Plaintiff reported her interests include shopping and spending time with her friend. Dr. Johnson increased her Doxepin dosage. On June 18, 2013, Plaintiff reported recently having filed for an order of protection against her mother after her mother became physically and verbally aggressive. Plaintiff complained of her mood still being irritable. Dr. Johnson continued Plaintiff's medication regimen.

In follow-up treatment on July 9, 2013, Dr. Johnson noted Plaintiff's memory and concentration were intact. Plaintiff reported that her mood was mostly irritable Dr. Johnson adjusted Plaintiff's medication regimen by starting a trial of Gabapentin at bedtime. In follow-up on July 23, 2013, Plaintiff reported adverse effects after starting Gabapentin. Dr. Johnson adjusted Plaintiff's medication regimen.

Plaintiff returned on August 15 and 19, 2013, complaining of increased pain on Gabapentin and her mood was mostly irritable. Dr. Johnson noted Plaintiff was cooperative, and her memory and concentration were intact. Dr. Johnson adjusted Plaintiff's medication regimen. Although Dr. Johnson wanted Plaintiff to start a trial of Cymbalta, she never started the trial.

When Plaintiff returned on September 9, 2013, she reported having been off all medications since August 17, 2013, and smoking ten cigarettes a day. Dr. Johnson noted Plaintiff was cooperative and her memory and concentration were intact. Plaintiff reported her mood was mostly aggravated. Dr. Johnson restarted a trial of Doxepin. On October 8, 2013, Plaintiff questioned whether the dosage of Doxepin was enough. Dr. Johnson increased Plaintiff's dosage of Doxepin.

On November 19. 2013, Plaintiff reported being agitated by her father questioning her about not having a job. Dr. Johnson noted Plaintiff's memory and concentration were intact, and Plaintiff had severe family, housing, and occupational problems. Although Dr. Johnson discussed prescribing other medications, Plaintiff would only consent to an increased dosage of Doxepin. In follow-up on December 19, 2013, Plaintiff reported that she discontinued taking Doxepin after Dr. Lambrou prescribed a medication regimen of Flexeril, Valium, Norco, and Doxcycline. Plaintiff reported continued irritable mood and difficulty coping with interpersonal problems. Dr. Johnson noted Plaintiff's memory and concentration were intact. Dr. Johnson discontinued Doxepin due to noncompliance and prescribed Lamotrigine.

On January 22, 2014, Plaintiff reported her mood was mostly irritable. Dr. Johnson noted that Plaintiff continued to have chronic irritable mood and problems tolerating Lamictal and started a new trial of Prozac.

Dr. Johnson completed a two page "Medical Source Statement - Mental" ("MSSM"), on January 13, 2014, at the request of Plaintiff's counsel. In that MSSM, Dr. Johnson found Plaintiff could not complete a normal workday or workweek without interruption from psychologically based symptoms, and could not perform a consistent pace without an unreasonable number and length of rest breaks. Dr. Johnson indicated that Plaintiff had no limitations in memory and only moderate limitations in maintaining attention and concentration for extended periods. Dr. Johnson opined that Plaintiff was markedly limited in her ability to accept instructions, to respond appropriately from criticism from supervisors, and to get along with coworkers.

### 3. **Southeast Missouri Hospital** (Tr. 457-504)

Between July 28, 2011, and December 23, 2013, Plaintiff received treatment at Southeast Missouri Hospital.

On July 28, 2011, Plaintiff presented for evaluation of an abscess. The treating doctor observed Plaintiff ambulating without assistance and noted a normal psychiatric examination with normal insight and concentration.

During treatment on August 10, 2012, a physical examination of Plaintiff's back showed no tenderness or palpation and a normal inspection. The treating doctor noted Plaintiff had normal insight and concentration.

During treatment on January 9, 2013, the treating doctor found Plaintiff had normal insight and concentration.

On May 5, 2013, Plaintiff presented complaining of low back pain after riding a lawn mower for 90 minutes. Radiology results showed extensive bilateral nephrolithiasis.[4]

[4]Nephrolithiasis is defined as the process of forming a kidney stone. www.medicinenet.com/script/main/art.asp?articlekey=6806.

An x-ray of Plaintiff's lumbar spine showed narrowing of the L5/S1 disc space and bilateral nephrolithiasis. An MRI of Plaintiff's lumbar spine showed a mild disc extrusion at L5/S1 producing spinal stenosis, encroachment of S1 and S2 nerves by large paracentral left disc extrusion, mild central canal stenosis, and bilateral mild-moderate foraminal stenosis. Dr. Scott explained to Plaintiff that she was not a good surgical candidate due to lack of prior conservative treatment and lack of correlating symptoms. Dr. Scott referred Plaintiff for pain management treatment and recommended smoking cessation.

During treatment on December 23, 2013, the treating doctor noted Plaintiff was cooperative and oriented to person, place, and time.

### 4. <u>Chaffee Medical Clinic - Dr. Thymois Lambrou</u> (Tr. 512-13, 542-46)

Between December 3, 2013, and February 6, 2014, Dr. Thymois Lambrou treated Plaintiff for chronic back pain and anxiety by prescribing medications.

Dr. Lambrou completed a two page "Medical Source Statement - Physical" ("MSSP"), dated January 16, 2014, at the request of Plaintiff's counsel. In that MSSP, Dr. Lambrou found Plaintiff could lift/carry less than five pounds; stand/walk continuously less than 15 minutes; stand/walk throughout an eight hour workday less than one hour; sit continuously without a break for less than 15 minutes; sit continuously with usual breaks for less than one hour; and limited push/pull capability.

### 5. <u>Cape Spine & Neurosurgery - Dr. Brandon Scott</u> (Tr. 548-53)

On referral by Dr. Lambrou, Plaintiff presented with lower back pain for an evaluation by Dr. Brandon Scott. Plaintiff reported that her back pain was at a level ten, but she had no functional limitation and was able to function independently. Plaintiff reported not seeking any

conservative treatment for her low back pain. Dr. Scott observed that Plaintiff's gait was normal, and straight leg raise testing produced negative results. Lower back examination showed no pain with palpation, and full active and passive range of motion in flexion, extension, lateral flexion and rotation. Neurologic examination showed recent and remote memory were intact, and Plaintiff was alert and oriented. Dr. Scott listed in his assessment: lumbar disc extrusion; degeneration of lumbar disc; and spinal stenosis, lumbar region, without neurogenic claudication (mild, improving).

### 6. <u>Southeast Primary Care - Dr. Charity Sandvoe</u> (Tr. 361-94)

Between May 13, 2013, and November 21, 2013, Dr. Charity Sandvoe treated Plaintiff as her primary care physician.

On May 13, 2013, Plaintiff established care and reported worsening chronic low back pain. Examination showed lumbar spine tenderness. Dr. Sandvoe prescribed Norco. In follow-up treatment on May 21, 2013, Plaintiff acknowledged her back pain symptoms were not as severe, and that she failed to pick up the prescribed medication after her last visit. Plaintiff returned on June 10, 2013, and reported her back symptoms were aggravated by daily activities.

In follow-up treatment on July 10, 2013, Plaintiff reported no longer being treated by Dr.Vaught because she could not afford him, and that her back pain was stable. Plaintiff reported some relief with muscle relaxers. On July 24, 2103, Plaintiff reported her back pain was stable, and her symptoms were aggravated by daily activities. Dr. Sandvoe continued Plaintiff's medication regimen. During treatment on November 21, 2013, Plaintiff declined Dr. Sandvoe's offer for a referral to a clinic at Washington University where neurosurgeons treat patients with no insurance.

### 7.  Regional Brain & Spine - Dr. Kevin Vaught (Tr. 348-59)

On June 4, 2013, and January 2, 2014, Dr. Kevin Vaught treated Plaintiff's low back pain.

In a New Patient First Appointment Form completed by Plaintiff on June 4, 2013, Plaintiff reported having low back pain since December 2010, and having been treated with medications, physical therapy, exercise, and bed rest. In treatment on January 2, 2014, Plaintiff explained that she started having slight lower back pain in 2010 but in early May she experienced sharp pain in her left lower back with pain radiating into her leg. Plaintiff questioned whether a "walker use is indicated." (Tr. 348) A mental status examination showed Plaintiff's memory was intact for recent and remote events and her attention/concentration was normal. Dr. Vaught noted Plaintiff had an abnormal, wide stance gait. Radiographic images showed normal lumbar lordosis and a very large left-sided disc herniation. Dr. Vaught discussed definitive therapy with surgical recommendations, as well as conservative management with steroids. Plaintiff elected the conservative treatment, and Dr. Vaught prescribed a Medrol Dosepak and a proton pump inhibitor.

### 8.  Neurosciences Center - Dr. Aaron Koonce (Tr. 328-38)

On July 1, 2013, Plaintiff presented for neurological evaluation of muscle twitching. Plaintiff had a walker to use as needed. Plaintiff reported a memory impairment with associated symptoms including forgetfulness and poor concentration. Examination showed a normal musculature, no joint deformities, and a normal range of motion for all four extremities. Dr. Koonce found Plaintiff to be "very embellished" during strength testing and examination, and observed Plaintiff "quickly hop[] right down from examination table to the floor upon request." (Tr. 337) Dr. Koonce also observed Plaintiff having no trouble with ambulation and assessed a

normal neurological examination with embellishment.

In follow-up treatment on August 12, 2013, Plaintiff reported spontaneous improvement in her muscle twitching. The lab studies showed normal results. Dr. Koonce noted that Plaintiff used a wheeled walker to ambulate on that day. Dr. Koonce observed Plaintiff climb up and down the examination table without assistance or apparent difficulty and noted her examination remained very embellished.

### 9. Southeast Missouri Hospital (Tr. 268-301)

On three occasions between June 7, 2012, and August 10, 2012, Plaintiff received treatment at Southeast Missouri Hospital for abdominal pain and women's issues. Plaintiff reported not feeling sad or depressed. During treatment, psychiatric examination showed Plaintiff was oriented with normal affect, insight, and concentration. Examination of Plaintiff's back showed no tenderness, normal inspection, and her gait was normal.

### 10. Saint Francis Medical Center (Tr. 322-26)

On April 4, 2013, Plaintiff presented in the emergency room at Saint Francis Medical Center complaining of abdominal and groin pain, and received treatment for a kidney stone. No previous psychiatric history was indicated in the past medical history section. Examination showed no back pain and no tenderness to palpation. The treating doctor observed Plaintiff had no anxiety, normal insight, and normal concentration. The nurse observed Plaintiff to have a steady gait and noted Plaintiff was cooperative, alert, and oriented x3.

### 11. Safe House for Women - Charlie Harrison (Tr. 447-50, 506-07)

On January 9, 2014, Charlie Harrison, MS, LPC, completed on intake assessment. Mr. Harrison noted that Plaintiff had been the victim of traumatic events on several occasions,

including domestic and sexual violence. Plaintiff reported a markedly diminished interest in enjoyable activities, isolating herself from others, and difficulty concentrating.

Mr. Harrison completed a two page "Medical Source Statement - Mental" ("MSSM"), finding Plaintiff markedly limited in her ability: to understand detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity of others; and to complete a normal workday. In social interaction, Mr. Harrison found Plaintiff to be markedly limited in her ability to respond appropriately to criticism from supervisors.

### 12. Cape Girardau Uriology Associates - Dr. Donald Gentle (Tr. 452-55)

During treatment for kidney stones on April 8, 2013, Plaintiff reported being generally satisfied with life. Dr. Gentle noted Plaintiff had a normal gait, and she was oriented to time, place, and person.

### 13. Other Record Evidence

#### a. *Medical Opinion -Dr. Anne Winkler* (Tr. 519)

At the request of the ALJ, Dr. Anne Winkler completed a Medical Opinion form dated February 19, 2014, after reviewing the available medical evidence.[5] Dr. Winkler found that Plaintiff had psychiatric issues, medulllary sponge kidney, and degenerative disc disease ("DDD") established on May 29, 2013, but that none of her impairments, combined or separately, met or equaled any impairment described in the Listing of Impairments. In support, Dr. Winkler cited the medical evidence, including normal imaging and no impairments from lumbar degenerative disc disease. Dr. Winkler deferred psychiatric issues to the mental health experts. Dr. Winkler opined

---

[5]At the time Dr. Winkler prepared this opinion, Dr. Lambrou's treatment notes from December 3, 2013, through February 6, 2014, and the medical record from Cape Spine & Neurosurgery dated February 11, 2014, were not part of the record available to Dr. Winkler. (Tr. 541-53)

that the medical evidence did not support any manipulative limitations inasmuch as there was no evidence of upper extremity problems. Likewise, Dr. Winkler noted there was no support in the record for any environmental limitations.

Dr. Winkler completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) ("MSS"). Dr. Winkler found Plaintiff could lift/carry up to ten pounds frequently and up to twenty pounds occasionally; sit for eight hours in a workday; stand for three hours in a workday; and walk for four hours in a workday. Dr. Winkler found no limitations with the use of Plaintiff's hands. As to postural limitations, Dr. Winkler found Plaintiff could never climb ladders or scaffolds, and could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl.

### b. *Disability Determination Explanation -Dr. Robert Cottone* (Tr. 59-63)

Dr. Robert Cottone, a state agency psychologist, completed a Disability Determination Explanation in connection with Plaintiff's disability claim, dated October 19, 2012. In forming his opinion, Dr. Cottone considered a SSA field office disability report and Dr. Johnson's October 9, 2012, treatment note. Dr. Cottone opined that "[t]here are moderate cpp[6] and social limits at worst. She should avoid public contact work. ... Her reported limitations appear more severe than would be predicted based on the medical evidence and history of treatment." (Tr. 60) In a Mental Residual Functional Capacity assessment ("MRFC") completed on the same day, Dr. Cottone found Plaintiff has understanding and memory limitations in that she is markedly limited in her ability to understand and remember detailed instructions. Dr. Cottone further found Plaintiff has sustained concentration and persistence limitations in that she is markedly limited in

---

[6]The undersigned interprets cpp to be shorthand for concentration, persistence, or pace.

her ability to: maintain attention and concentration for extended periods; to carry out detailed instructions; to work in coordination with or proximity to others; and to complete a norm al workday or workweek without interruptions from psychologically based symptoms. Dr Cottone also found Plaintiff has social interaction limitations in that she is markedly limited in her ability to: interact appropriately with the general public; to get along with coworkers; and to accept instructions and respond appropriately to criticism from supervisors.

## IV.   **Standard of Review and Analytical Framework**

To be eligible for Supplemental Security Income ("SSI"), Plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). Additionally, a claimant will be found to have a disability "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for

disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, she is not eligible for disability benefits.  If the claimant has a severe impairment, the ALJ proceeds to step three and determines whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed, or is equal to a listed impairment, the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed, or is not the equivalent of a listed impairment, the ALJ proceeds to step four which asks whether the claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ proceeds to step five to determine whether the claimant is capable of performing other work in the national economy.  In step five, the ALJ must consider the claimant's "age, education, and past work experience."  Only if a claimant is found incapable of performing other work in the national economy will he be found disabled.  20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

 In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

 1. The credibility findings made by the ALJ.

 2. The claimant's vocational factors.

 3. The medical evidence from treating and consulting physicians.

 4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

 5. Any corroboration by third parties of the claimant's impairments.

 6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

 Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the

available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549,

556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing

court might have reached a different conclusion had it been the finder of fact in the first instance.

Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if

substantial evidence supports the Commissioner's decision, the court "may not reverse, even if

inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a

different outcome").

## V.    Analysis of Issues Presented

The broad issue in this case is whether the final decision of the Commissioner is supported by substantial evidence on the record as a whole.  In her brief before this Court, Plaintiff contends that the ALJ committed reversible error when:  (1) the ALJ failed to specify what weight he gave to the opinion of Dr. Courtney Johnson, her treating psychiatrist, and the reasons why he discredited her opinions; and (2) the ALJ's RFC is not supported by substantial weight.  As explained below, because the Court finds the ALJ erred in articulating what weight, if any, he assigned to the opinions of  Dr. Johnson and his reasons for doing so, the Court will only address this issue.

In his written decision, the ALJ assessed Dr. Johnson's MSSM as follows:

> The undersigned has considered the medical source statement from the [Plaintiff's] psychiatrist, Courtney Johnson, M.D.  However, while the medical evidence of record does demonstrate some degree of psychological impairment, it does [not][7] support the degree of limitation opined by Dr. Johnson.   Mental status examinations have consistently revealed normal attention, concentration and memory.  Although Dr. Johnson's treatment notes document subjective reports of anxiety and irritability, these allegations are not totally consistent with the [Plaintiff's] activities of daily living.  As noted, she goes shopping, she can go out alone, and she goes to the library.  This shows that the [Plaintiff] is capable of at least limited social interaction. ...  The medical evidence of record, as just described, does not support marked and extreme limitations.

(Tr. 18) (internal citations omitted)

The record before the ALJ also includes the opinion of state agency psychologist Dr. Cottone that Plaintiff has "moderate cpp and social limits at worst.  She should avoid public contact work....  Her reported limitations appear more severe than would be predicted based on

---

[7]The undersigned finds that the ALJ clearly intended to have "not" in this sentence.

the medical evidence and history of treatment." (Tr. 60)  In the January 13, 2014, MSSM, Dr. Johnson, Plaintiff's treating physician, opined that Plaintiff was markedly limited in her ability to accept instructions and respond appropriately from criticism from supervisors and to get along with coworkers.  Dr. Johnson further opined that Plaintiff had experienced no limitations in memory and had only moderate limitations in maintaining attention and concentration for extended periods.

In the October 19, 2012, MRFC, Dr. Cottone found Plaintiff had understanding and memory limitations in that she was markedly limited in her ability to understand and remember detailed instructions.  Dr. Cottone further found Plaintiff had sustained concentration and persistence limitations in that she was markedly limited in her ability to:  maintain attention and concentration for extended periods; carry out detailed instructions; work in coordination with or proximity to others; and complete a norm al workday or workweek without interruptions from psychologically based symptoms.  Dr. Cottone also found Plaintiff had social interaction limitations in that she was markedly limited in her ability to:  interact appropriately with the general public; get along with coworkers; and accept instructions and respond appropriately to criticism from supervisors.

Having reviewed the entire record, the undersigned concludes that the ALJ erred in his treatment of the opinion evidence in this case.  When evaluating opinion evidence, an ALJ must explain in his decision the weight given to any opinions from treating sources, nontreating sources, and nonexamining sources.  See 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).  By explaining the weight given to such medical source opinions, an ALJ both complies with the Regulations and assists the Court in its review of the decision.  See Willcockson v. Astrue, 540

F.3d 878, 880 (8th Cir. 2008). Further, Social Security Ruling 96-6p dictates that "[f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the [ALJ] ... level[] of administrative review." SSR 96-6p, 1996 WL 362203, at *34467. Accordingly, "the [ALJ] ... must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists." Id. at *34468.

Generally, the Commissioner is to give a treating medical source's opinion on the issues and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). The Commissioner may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (citations omitted). "Unless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant[.]" 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). In circumstances where a medical source opinion may affect the outcome of a case, substantial evidence does not support an ALJ's adverse decision if it cannot be determined what, if any, weight the ALJ afforded the opinion. McCadney v. Astrue, 519 F.3d 764, 767 (8th Cir. 2008) (An ALJ can discount a treating physician's opinion, but must explain why); see also Woods v. Astrue, 780 F. Supp. 904, 913-14 (E.D. Mo. 2011).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c), at *5 (requiring the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)"). Whether the ALJ grants a treating physician's substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)). "Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand." Anderson v. Barnhart, 312 F.Supp.2d 11876, 1194 (E.D. Mo. 2004). See also Tilley v. Astrue, 580 F.3d 675, 680-81 (8th Cir. 2009); Singh v. Apfel, 222 F.3d 448, 452-53 (8th Cir. 2000).

Dr. Johnson's MSSM includes mental limitations more restrictive than those determined by the ALJ. Indeed, Dr. Johnson opined Plaintiff was markedly limited in her ability to accept instructions and respond appropriately from criticism from supervisors and to get along with coworkers. Although the ALJ discussed the findings of Dr. Johnson in his decision and found that the medical evidence of record supported some degree of psychological impairment, even the degree of limitation opined by Dr. Johnson, the ALJ's analysis as to Plaintiff's RFC contains no mention of such limitations. Because the extent to which the ALJ may credit or discredit Dr. Johnson's opinions may affect the outcome of this case, the ALJ's failure to fully address these opinions and fully explain the weight given to them renders his decision of non-disability

unsupported by substantial evidence. The "primary difficulty is not with the possibility that the ALJ discounted [the] opinion[;] ... the problem with the ALJ's opinion is that it is unclear whether the ALJ *did* discount [the] opinion, if it did so, why." <u>McCadney</u>, 519 F.3d at 767.

Moreover, a review of the ALJ's decision shows the ALJ neither applied the factors as required, nor provided sufficient reasons for discrediting Dr. Johnson's opinions. The ALJ found that the medical evidence and Plaintiff's daily activities did not support the marked limitations found by Dr. Johnson in the MSSM. In discounting the opinions in Dr. Johnson's MSSM, the ALJ did not adhere to the factors identified in 20 C.F.R. §§ 404.1527(c), 416.927(c). Accordingly the Court finds that the ALJ failed to provide sufficient reasons in weighing Dr. Johnson's opinions. This is an issue for the ALJ, not the Court, to address in the first instance. <u>See</u> <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 569 (8th Cir. 1999).

Here, the ALJ gave significant weight to the opinions of Dr. Cottone over that of Dr. Johnson, Plaintiff's treating psychiatrist. Although the ALJ is required to consider the findings made by state-agency physicians and psychologists, the undersigned cannot say that Dr. Cottone's findings are supported by better or more thorough medical evidence than Dr. Johnson's. Nor was Dr. Johnson's MSSM's inconsistent overall with her records from Plaintiff's office visits, which are replete with references to Plaintiff's irritability and anxiety. In her MSSM, Dr. Johnson indicated that Plaintiff had no limitations in memory and only moderate limitations in maintaining attention and concentration for extended periods which is consistent with her mental examinations in her treatment notes. Moreover, the ALJ did not specify what weight, if any, he placed on the opinions of Dr. Johnson.

In his written decision, the ALJ also found that Plaintiff's activities of daily living

demonstrated her ability to have limited social interaction and were "not as limited as one would expect, in light of her allegations fo disabling medical and mental impairments." (Tr. 18) Although the undersigned agrees that shopping is an activity that necessarily includes interaction with the public, going out alone and going to the library are not activities the necessarily include substantial interaction with the public or require the ability to accept instructions, respond appropriately to criticism, or to get along with coworkers. Other than the ALJ's finding that Plaintiff's self-reported daily activities demonstrate her ability for some limited social interaction, the ALJ does not discuss or address how these daily activities would have any bearing on Plaintiff's ability to accept instructions or respond appropriately to criticism form supervisors or get along with coworkers. The ALJ does not discuss or address any of Plaintiff's daily activities or the extent to which such activities are inconsistent with Plaintiff's consistent subjective complaints which would impact her ability to accept instructions or respond appropriately to criticism. Further, the RFC includes some limitations regarding Plaintiff's ability to be around others.

The undersigned believes that reversal and remand are required here for further proceedings and are not merely a harmless defect in opinion writing. See Willcockson v Astrue, 540 F.3d 878, 879-880 (8th Cir. 2008) ("Several errors and uncertainties in the [ALJ's] opinion that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying [the Plaintiff's] claims to require further proceedings....").

On remand, the ALJ should specifically identify what, if any, weight is to be given to Dr. Johnson's opinions. McCadney, 519 F.3d at 767. The ALJ must then apply the factors as required by 20 C.F.R. §§ 404.1527(c), 416.927(c), and articulate specific reasons for the weight

given, if any, to Dr. Johnson's opinions. See Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) (noting "inaccuracies, incomplete analyses, and unresolved conflicts of evidence" are proper basis for remand). The ALJ should also clarify the limits of Plaintiff's lifting capacity.

**V.  Conclusion**

For the foregoing reasons, the ALJ's decision is not supported by substantial evidence on the record as a whole. Where an ALJ fails to properly consider opinion evidence of record, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole. See Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001). In the instant case, the ALJ failed to properly evaluate Dr. Johnson's opinion and assign weight to be given when to that opinion. The matter will therefore be remanded for further consideration.

Although the Court is aware that the ALJ's decision as to non-disability may not change after properly considering all the evidence of record and undergoing the required analysis, the determination is nevertheless one that the Commissioner must make in the first instance. See Pfitzner, 169 F.3d at 569.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be REVERSED. A separate Judgment in accordance with this Memorandum and Order is entered this same date.


Dated this 21st  day of September, 2016.

/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE